IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CRIMINAL NUMBER |
| : | |
| v. : | |
| : | No. 08-222 |
| : | |
| DONTE FISHER a/k/a : | |
| "JIHAD SMALLS" : | |

SURRICK, J.                                                                                           OCTOBER 27, 2008

**MEMORANDUM & ORDER**

Presently before the Court is Defendant Donte Fisher's Motion To Suppress Evidence (Doc. No. 19). A Suppression Hearing was held on October 3, 2008. For the following reasons, Defendant's Motion will be denied.

**I.     BACKGROUND**

On April 22, 2008, Defendant Donte Fisher ("Defendant") was indicted on one count of possession with the intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), one count of using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Doc. No. 1.) All three Counts are the result of a traffic stop that occurred on January 31, 2008, in the area of North Seventh and West Huntingdon Streets in Philadelphia.

**II.    FINDINGS OF FACT**

On January 31, 2008, at approximately 9:50 PM, the Philadelphia Police Department's East Task Force (the "Task Force") was patrolling in a caravan of four squad cars in sector S of

the 26th Police District near the intersection of North Seventh and West Huntingdon Streets. (Suppression Hr'g Tr. 8-9, Oct. 3, 2008; Government's Exs. 1, 3.)  There were two officers in each car.  Sergeant Derrick Hawkins and Officer Jeffery Mannings were in the lead followed by Officers Joe Logan and Shanda White in the second car, Officers Matthew McCarthy and Stacie Valentine in the third car, and Officers Robert Tavarez and Edwin Carea in the final car. (Suppression Hr'g Tr. 8, 29, Oct. 3, 2008.)  The caravan was engaging in an "attack" of the area, a patrolling strategy that involves members of the Task Force entering high crime areas in force, often using unorthodox patrolling techniques intended to take individuals publicly involved in criminal activity by surprise.  (*Id.* at 6-7, 18-20.)

On the night in question, the caravan headed southbound down North Franklin, which is a one-way northbound street.  (*Id.* at 9.)  The caravan turned east onto West Huntingdon, again going the wrong direction on a one-way street.  (*Id.*)  As the caravan approached the 2500 block of North Seventh, officers in two of the cars noticed a grey Chevrolet Lumina (the "Lumina") traveling toward the caravan, westbound (the proper direction) on West Huntingdon.  (*Id.* at 9, 31.)  The Lumina turned left off of West Huntingdon and on to the 2500 block of North Seventh, where it proceeded to cruise slowly in the parking lane on the east side of the street.  (*Id.* at 30.) As the Lumina turned, Officer Logan, who was in the second car in the caravan, noticed that the Lumina's windows were darkly tinted, preventing him from seeing inside the car.  (*Id.*)  Officer Logan also observed that the Lumina appeared not to have a registration tag.[1]  (Government's Ex. 2.)

---

[1] It later turned out that the Lumina had a temporary registration tag taped to the back window.  (*Id.* at 45.)  The dark tinting on the windows prevented Officer Logan from seeing the valid tags.  (*Id.*)

The caravan turned right onto the 2500 block of North Seventh and Officer Logan pulled behind the Lumina and activated his squad car's overhead lights. (*Id.* at 32.) In the meantime, Sergeant Hawkins pulled his squad car, the first in the caravan, in front of the Lumina, which had stopped in parking lane on the far left of the street in front of 2543 North Seventh. (*Id.* at 10.) Upon stopping the Lumina, the driver quickly exited the vehicle, leaving the car running and the driver's door open, and ran up the front steps of 2543 North Seventh. (*Id.* at 10, 33.) The house at 2543 North Seventh was known to the officers of the Task Force. Frequently loiterers and suspected drug dealers on the corner of West Huntingdon and North Seventh would flee to this house when police patrolled the area. (*Id.* 14-17.) Several officers from the caravan ran after the driver. Officer McCarthy was the first to reach him. (*Id.* at 11.)

Officer Logan initially intended to go after the driver but he noticed the silhouette of a person in the passenger seat of the Lumina. (*Id.* at 33.) He informed his fellow officers that there was a passenger in the car and proceeded to the passenger's door to investigate. (*Id.* at 33-34.) The window of the passenger's door was too heavily tinted for Officer Logan to see inside, so he opened the door. (*Id.* at 34.) When he opened the door, he saw Defendant, slouched down in the seat with his head well below the headrest. (*Id.* at 11, 35.) Officer Logan was concerned that Defendant might be attempting to hide drugs or a gun under the seat or that he was attempting to conceal himself.[2] (*Id.* at 35.) Officer Logan's concern was heightened by the area in which the stop occurred, which is known to the Philadelphia Police Department and the officers of the Task Force on patrol that night as a high crime area. The corner of West

---

[2] Both Sergeant Hawkins and Officer Logan testified that attempting to evade detection by the police in such a manner suggests to them that a suspect might be wanted. (*Id.* at 25, 35.)

Huntingdon and Seventh in particular is known as a location for drug dealing and other crimes. (*See id.* at 15-16, 35, 37; Government's Exs. 3-6).

Officer Logan asked Defendant for his name and identification. (Suppression Hr'g Tr. 35, Oct. 3, 2008.) Defendant did not respond. (*Id.*) Officer Logan then requested that Defendant exit the vehicle. Defendant complied. (*Id.* at 36.) As Defendant exited the vehicle, Officer Logan noticed a bulge in Defendant's clothing at his right hip. (*Id.*) Given the neighborhood, the conduct of the driver, and the conduct of Defendant–slouching in the passenger's seat and refusing to state his name or provide identification–Officer Logan suspected that the bulge was a gun and immediately patted down the area of the bulge.[3] (*Id.* at 36-37.) He felt the butt of a gun, confirmed that it was in fact a gun, and alerted his fellow officers of what he had found. (*Id.* at 36.) Defendant was arrested and placed in handcuffs (*Id.* At 37)[4]

---

[3] Officer Logan testified that he would have done a protective frisk of Defendant regardless of whether he had noticed the bulge because of the neighborhood and circumstances made him concerned for his safety and the safety of his fellow officers. (*Id.* 46.) In addition, Officer Logan testified that he intended to detain Defendant by placing Defendant in the squad car where Defendant would be not be free to leave pending Officer Logan's investigation. (*Id.* at 44.) In fact, Officer Logan noticed the bulge, which provoked the safety frisk. Officer Logan then found the gun and lawfully arrest Defendant. What he intended to do before he found the gun or would have done if there had been no gun are of no consequence. *See United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006) ("[S]ubjective motive or intent is not relevant for Terry purposes.").

[4] Officer Logan testified that in his experience, it is common for people in the area where the stop occurred to be carrying a gun. (*Id.* at 37.) His experience is borne out by the statistics kept by the Police department. During the thirteen month period spanning January 1, 2007, to January 31, 2008, in the roughly eight block by four block area that makes up sector S, there were twelve aggravated assaults where victims were shot; three robberies involving firearms; forty-four reports of gunshots; and four reported violations of the Uniform Firearms Act (VUFA). (*Id.* at 49-51; Government's Ex. 3.) On the corners of the North Seventh and West Huntingdon intersection, there were eight narcotics arrests, a VUFA with a gunshot wound, and several reports of gunshots in the same thirteen month period. (Suppression Hr'g Tr. 53, Oct. 3, 2008; Government Ex. 3.)

Officer Logan performed a search incident to arrest and recovered four golf ball size chunks of what was later determined to be crack cocaine. (*Id.*)  The officers did not issue the driver of the Lumina a traffic citation since they had made an arrest pursuant to the traffic stop. (*Id.* at 46.)

At the Suppression Hearing on October 3, 2008, the Government called Sergeant Hawkins and Officers Logan, McCarthy, and Mannings to testify about the events that occurred on January 31, 2008.  The Government also called Corporal DeMalto of the Statistical Section of the Philadelphia Police Department's Research and Planning unit to testify about the crime statistics for sector S of the 26th Police District.  Defendant called the alleged driver of the Lumina, Martin Colon; Defendant's cousin, Tamara Allen; and Quincy Sampson, an individual upon whom Officer Manning performed a pedestrian stop while other officers in the caravan were dealing with the driver of the Lumina and Defendant.  The testimony of the sergeant, the corporal and the officers was consistent with few minor differences and it was credible.  Colon, Allen and Sampson are either friends of defendant or related to him.  Their testimony was completely inconsistent with the testimony of the police officers, and was not credible.[5]

---

[5] For example Allen testified that on January 31, 2008 at 9:50 p.m. she was looking out the front window of 3543 North Seventh Street.  She testified that the window was open because she was looking for a taxi.  She saw seven police cars pull up to the Chevy Lumina which had been parked the entire fifteen minutes that she had been looking out of the open window.  The police officers then got out of their vehicle, went to the Lumina and pulled the Defendant out of the front passenger seat.  She testified that at no time did anyone get out of the driver's side of the car.  Allen is Defendant's cousin.  Her explanation of how she was standing at an open window in January for fifteen minutes and just happened to see her cousin pulled out of the car lacked the ring of truth.  Furthermore, the manner in which she delivered this story was not compelling.

Martin Colon testified that he has driven the Chevy Lumina before but that he was not driving it on the night of January 31st.  He testified that he has never been in the Chevy Lumina

### III.     DISCUSSION

Defendant seeks to suppress all physical evidence seized on January 31, 2008, arguing that searching Defendant, who was a passenger, pursuant to a traffic stop was a violation of his constitutional rights.

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States,* 517 U.S. 806, 810 (1996); *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006). Here, the Lumina had excessively tinted windows in violation of the Pennsylvania Vehicle Code, 75 Pa. Cons. Stat. § 4524(e)(1), and Officer Logan believed that the vehicle was not properly registered. Officer Logan had probable cause to believe that traffic violations had occurred. *See United States v. Warren*, Crim. A. No. 07-562, 2008 U.S. Dist. LEXIS 21386, at *4 (E.D. Pa. Mar. 19, 2008)

---

with Defendant.  Colon was on parole on the night of this incident and it would have been a violation of the conditions of his parole if he had been in the Chevy Lumina with Defendant because Defendant is a convicted felon.  Colon testified that he had been at the Chinese store on the corner of 7th Street and was on the way back to a friend's house to use the bathroom when the police jumped out of the patrol cars and told him to put his hands up.  The friend's house was 2543 N. Seventh Street.  Colon did not know who owns the Chevy Lumina and did not know the name of the person who gave his permission to drive it.  Clearly, Colon had more than enough reasons to lie.  If he admitted being with Defendant, he was admitting a parole violation.

Quincy Sampson is a friend of Defendant's who had been arrested by the police for selling drugs in the neighborhood of North Seventh and West Huntington Streets.  He testified that on the night of this incident he had driven a Yukon SUV onto 7th Street and parked across from the Chevy Lumina.  Sampson testified that he was walking up the street when the police pulled up.  The Chevy Lumina had not moved and no one got out of the vehicle.  When the police pulled up they went to the Lumina and removed Defendant from the vehicle.   Officer Manning testified that there was no search of the Yukon.

Sampson testified that the police stopped him and searched him.  They also searched his Yukon SUV.  Officer Jeffrey Manning testified that he stopped Sampson because he was attempting to leave the area quickly when the police arrived.  Because of the nature of the investigation and the location of the area, Officers Manning simply wanted to get Sampson's identity.  The testimony of the police officers was simply more credible than the testimony of Sampson who is a friend of Defendant's and evidently sells drugs in the neighborhood.

(holding protective frisk was reasonable pursuant to a stop instigated by police in a high crime area where defendant was in a car with illegally tinted windows and where defendant appeared nervous and made furtive movements toward his right hip area).

The Supreme Court has repeatedly recognized that "traffic stops are dangerous encounters that result in assaults and murders of police officers." *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997) (discussing *Maryland v. Wilson*, 519 U.S. 408, 413 (1997); *Michigan v. Long*, 463 U.S. 1032, 1047 (1983); *United States v. Robinson*, 414 U.S. 218, 234 n.5 (1973); *Adams v. Williams*, 407 U.S. 143, 148 n.3 (1972)). The presence of a passenger in a vehicle pulled over in a traffic stop increases the danger to the police officer. *Moorefield*, 111 F.3d at 13 (citing *Wilson*, 519 U.S. at 414). An officer may ask passengers in a car for identification and run background checks on them. *Wilson*, 519 U.S. at 413-14; *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) ("[B]ecause passengers present a risk to officer safety equal to the risk presented by the driver an officer may ask for identification from passengers and run background checks on them as well.") (internal citations omitted).

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that a pat down search can be justified if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. The Third Circuit has recognized that the standard in *Terry* has been "extended . . . to situations involving officers and motorists." *Moorefield*, 111 F.3d at 13. When traffic stops occur in high crime areas "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *United States v. Wardlow*, 528 U.S. 119, 125 (2000).

In this case, the totality of the circumstances compels the conclusion that Officer Logan's protective frisk of Defendant was reasonable. Sector S of the 26th District is known as a high crime area, and the intersection of West Huntingdon and North Seventh in particular is notorious for drug and gun crime. The house that the Lumina pulled in front of was known to the Task Force members as a haven for suspected criminals. These are the sort of background facts that officers may consider when assessing the safety of a given situation or the likelihood that criminal activity is afoot, *see id.* at 125. They are facts that the officers in this caravan knew when they went on patrol on January 31, 2008.

Officer Logan had probable cause to pull the Lumina over based on the car's excessive window tinting and Officer Logan's good-faith belief that the car did not have a proper registration tag displayed.[6] The sequence of events that unfolded after he made the stop served to heighten his suspicion that the driver and the passenger of the car were engaged in criminal activity. When the driver jumped out of the Lumina and ran, leaving the engine running, leaving his door open, and fleeing to a house known for harboring suspected criminals, Officer Logan could properly draw a reasonable inference that, at the very least, the driver of the Lumina was engaged in criminal activity. *See United States v. Bonner*, 363 F.3d 213, 218 (3d Cir. 2004) ("Flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion.").

Defendant's conduct further heightened Officer Logan's suspicion. Defendant was

---

[6] Officer Logan's mistaken, but good-faith, belief that the Lumina did not have registration information properly displayed does not invalidate the legitimacy of the stop. *See Delfin-Colina*, 464 F.3d at 398.

8

slumped in his seat in a manner that suggested to Officer Logan that Defendant was trying to conceal something.[7]  *United States v. Valentine*, 232 F.3d 350, 257 (3d Cir. 2000) (noting factors in addition to location in a high crime area, such as "slouching, crouching, or any other arguably evasive movement . . . can add up to reasonable suspicion" (citing *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000)); *Warren*, 2008 U.S. Dist. LEXIS 21386, at *2-*3 (taking into account officer's belief that defendant was acting nervously); *see also Johnson v. Campbell*, 332 F.3d 199, 207-08 (3d Cir. 2003) (explaining how officers may form reasonable suspicion of criminal activity based on observations of legal behavior).  When Officer Logan asked Defendant to step out of the Lumina–which he was entitled to do, *see Bonner*, 363 F.3d at 216 (citing *Maryland v. Wilson*, 519 U.S. 408 (1997))–and he noticed the bulge at Defendant's hip, his suspicion that the bulge was a weapon was certainly reasonable.  *See Moorefield*, 111 F.3d at 13-14.  Thus, Officer Logan's decision to pat Defendant down was reasonable.  Finding the gun provided probable cause to arrest Defendant, which lead to a lawful search incident to arrest.  The search incident to the arrest produced the rocks of crack cocaine.

## IV.  CONCLUSION

For these reasons, we are compelled to conclude that the Defendant's Constitutional rights were not violated here.  Accordingly, Defendant's Motion to Suppress will be denied.

An appropriate Order follows.

---

[7] It is clear that a person's mere presence in a high crime area is not sufficient to create reasonable suspicion for a stop, and that a person approached by police in such an area need not respond to police inquiries.  *Bonner*, 363 F.3d at 217.  Here, however, considering the conduct of the driver, we do not doubt that Defendant's refusal to state his name or provide Officer Logan with identification was a factor that added to Officer Logan's reasonable suspicions.  Moreover, the fact that Defendant was a passenger in a car pulled over in a legal traffic stop provided a permissible basis upon which to request identification from Defendant.  *See Wilson*, 519 U.S. at 413-14 (officers may ask passengers for identification); *Rice*, 483 F.3d at 1084 (same).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL NUMBER |
| | : | |
| v. | : | |
| | : | No. 08-222 |
| | : | |
| DONTE FISHER a/k/a | : | |
| "JIHAD SMALLS" | : | |

### ORDER

AND NOW, this   27th   day of October, 2008, upon consideration of Defendant Donte Fisher's Motion To Suppress Physical Evidence seized on January 31, 2008 (Doc. No. 19), and after a hearing in open court, it is ORDERED that the Motion is DENIED.

IT IS SO ORDERED.

BY THE COURT:


/s/ *R. Barclay Surrick*, **Judge**